IVAN MAXIM SISLIK, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sislik v. Commissioner
Docket No. 39977-85
United States Tax Court
T.C. Memo 1989-495; 1989 Tax Ct. Memo LEXIS 498; 58 T.C.M. (CCH) 115; T.C.M. (RIA) 89495; September 7, 1989
Robert S. Fink, David J. Cohen, for the petitioner. Sandy E. Freund, Peter J. Graziano, Mildred M. Moon, for the respondent. SHIELDS
*500 MEMORANDUM FINDINGS OF FACT AND OPINION SHIELDS, Judge: By statutory notice of deficiency dated June 7, 1985, respondent determined deficiencies in and additions to petitioner's Federal income tax for the years and in the amounts as follows: Additions to Tax
Section
Section
Section
Section
Year
Deficiency
[1] 6653(b) 6653(b)(1)
6661
6654
1980
$ 26,972
$ 13,486
N/A
$ -0- $ 1,665
1981
49,641  24,821  N/A
-0-   3,805  1982
32,040   N/A
$ 16,020
5,000  2,923  Following concessions, the issues for decision are: (1) whether petitioner is entitled under section 913 to deductions for 1980 and 1981 for expenses of living abroad, (2) whether petitioner is entitled under section 911 to a foreign earned income exclusion for 1982, (3) whether petitioner is entitled under section 163 to interest expense deductions for years 1980, 1981, and 1982, (4) whether petitioner is entitled to business deductions *501 in 1980, 1981, and 1982 with respect to his airplane leasing activity, (5) whether part of any underpayment of tax by petitioner in 1980, 1981, and 1982 is due to fraud under section 6653(b), (6) whether petitioner is liable for the addition to tax provided by section 6661 for substantially understating his income tax for 1982, and (7) whether petitioner is liable for the addition to tax provided by section 6654(a) for underpayment of estimated tax for 1980, 1981, and 1982. FINDINGS OF FACT Some of the facts have been stipulated by the parties and are found accordingly. The stipulation of facts and the exhibits attached thereto are incorporated herein by reference. Petitioner is a citizen of the United States but has owned and resided in a condominium in Nassau, Bahamas, since 1973. He filed income tax returns for 1980, 1981, and 1982 with the Internal Revenue Service Center, Philadelphia, Pennsylvania. Since 1965 petitioner has been a pilot for Pan American World Airways, Inc. (Pan Am). During 1980, 1981, and 1982 he was a first officer (co-pilot) on Boeing 747's which Pan Am uses almost exclusively on international routes. Consequently, the majority of petitioner's working *502 hours during these years were spent flying to or from the United States and between foreign countries. During the years 1980 through 1982, Pan Am had base stations in New York, Miami, Los Angeles, San Francisco, and Berlin. Each pilot was assigned to one of these base stations where on paper all of his flight patterns originated and returned and where all of his administrative records were maintained by Pan Am. While in flight a Pan Am crew is under the control of the chief pilot of the nearest Pan Am base station with respect to any flight related or operational problem. However, with respect to any other matter a pilot or other member of a flight crew is under the administrative supervision of his base station. Pan Am's personnel records have listed petitioner's permanent address and telephone number at his condominium in the Bahamas since at least January 24, 1975. Pan Am also requires petitioner to maintain a stateside mailing address for company correspondence and petitioner keeps a post office box at the Miami airport for that purpose. During the years under consideration John F. Kennedy Airport (JFK) was petitioner's base station. While theoretically this meant that *503 all of petitioner's flight patterns started and ended at JFK, his first or last actual flight in a pattern was often from or to some other airport. When this occurred, Pan Am for pay purposes credited petitioner with flight time between JFK and his actual departure point or between the ending point of his flight pattern and JFK. However, when a flight pattern started or ended at a point other than JFK, petitioner at his option could fly directly to or from Nassau and the flight pattern's actual point of departure or arrival without first reporting to JFK. Either way, he received credit only from or to JFK and not from or to Nassau. Petitioner bought the condominium in Nassau in 1973. He has maintained no other residence in the United States or elsewhere since that time. It was where he ultimately returned after each pattern he flew for Pan Am in 1980, 1981, and 1982. During such years on the average he was physically present in Nassau for 15 days each month. Petitioner has never been a citizen of the Bahamas or possessed a Bahamian visa or certificate of residency. Since an individual has to be present in the Bahamas for eight consecutive months without an absence of 24 hours *504 or more in order to qualify for a certificate of residency, petitioner did not qualify because of his frequent absences from the country for several days at a time. In any event it was his understanding that his situation did not require him to get Bahamian permission to own and use the condominium in Nassau. During 1980, 1981, and 1982, petitioner's automobile was titled and insured in Nassau and he was a member of two local health clubs and socially active in Nassau. In 1982 petitioner became a member of the board of directors of Delaporte Point Condominiums where his unit is located. He paid Bahamian real estate taxes on his condominium for each of the years in question. During the same period his physician was a resident of Nassau while his dentist was a resident of New York, but as a friend of long standing, the dentist agreed to schedule dental appointments between petitioner's flight patterns. When he was first employed by Pan Am in 1965, petitioner had a bank account which he had opened as a child with Somerset Trust Company in Somerset, New Jersey. He continued to use it as his principal personal account through the years 1980, 1981, and 1982. At his request Pan *505 Am deposited his salary checks into this account. Petitioner was also a member of the Pan Am Credit Union in New York during 1980 through 1982 and maintained a separate bank account in the Bahamas, but paid most of his bills there with cash. In 1979 petitioner and Robert Taylor, another Pan Am pilot, met with a group of former Pan Am executives who had formed a commuter airline called Transtate. At that time the airline industry was in the midst of deregulation, and in the opinion of the group the future prospects of a commuter airline business were excellent. Petitioner and Taylor met with the Transtate group for the purpose of discussing the possibility of investing in the company. However, after the meeting petitioner, Taylor, and Joseph Gatt, one of Transtate's executives, decided to purchase two Britten Norman Islander aircraft and lease them to Transtate for use in its commuter operation. The three of them discussed the profit potential of the proposed leasing venture in great detail and each of them made a separate estimate of such potential. While petitioner's profit estimate was less than either of the others, they all expected the purchase and lease to be a profitable *506 venture. In their original plans petitioner, Taylor, and Gatt had expected to jointly finance the purchase of the two planes through the San Francisco office of the Pan Am Credit Union. However, before the loan could be processed, the San Francisco office stopped financing the purchase of planes. After this prospect of group financing evaporated, petitioner and Gatt each attempted to obtain an individual loan for the purchase of an airplane. Gatt apparently obtained his financing but petitioner was unsuccessful at both Somerset Trust and the New York branch of the Pan Am Credit Union because they had also stopped making aircraft loans. At this point petitioner approached Donald Aberle with the Columbus Trust Company, a Nassau bank. Aberle indicated that the loan could probably be arranged if petitioner would contact Lance Eisenberg, a Miami lawyer, to handle the loan details. Petitioner met with Eisenberg in December of 1979 and told him that he needed a loan to buy an airplane and that the transaction should be structured in such a way as to get him the most favorable tax consequences. Eisenberg, who had previously dealt with Aberle and Columbus Trust Company, recommended *507 that the loan be made by Columbo Trust Company, N.V., an affiliate of Columbus Trust based in the Netherland Antilles. Eisenberg also recommended that petitioner organize a Subchapter S corporation to take title to the airplane and receive the loan in order to take advantage of tax deductions during the start-up period while limiting petitioner's exposure to personal liability. With Eisenberg providing all the necessary legal services and using the name of his grandfather, Michal Rakus, petitioner organized Michal Rakus, Inc. ("Michal Rakus") as a Subchapter S corporation. At all relevant times petitioner was the corporation's sole stockholder and its president. Petitioner's condominium was used as the corporate address. Again with Eisenberg providing all necessary legal services, Michal Rakus proceeded to purchase an airplane, a Britten Norman Islander, for $ 279,000 after obtaining a loan from Columbo Trust in the amount of $ 235,000. The loan was represented by the corporation's promissory note and secured by a chattel mortgage on the airplane. As president of Michal Rakus, petitioner signed the note and chattel mortgage. The note bore interest at the rate of 18 percent per *508 annum which was not an unusually high rate for a loan on a commercial aircraft at that time. Petitioner opened an account for the corporation with Somerset Trust Company and during 1980, 1981, and 1982 made monthly interest payments of $ 4,129.04 on the note payable to Columbo Trust. All other operating and leasing expenses of the corporation during the same period were paid from this account. Petitioner caused the corporation to acquire insurance on the plane which would pay the balance due on the loan in the event the aircraft was destroyed. The aircraft was purchased from Jonas Aircraft and Arms, an English company which ferried it from England to the Waterbury-Oxford Airport in Connecticut, where the sale was closed in February of 1980. On behalf of his corporation petitioner had previously deposited $ 10,000 with Jonas and at the closing he paid approximately $ 30,000 more to Jonas. At the closing petitioner also paid or reimbursed Jonas for title and ferrying insurance on the aircraft as well as a number of other costs associated with taking possession of the aircraft and putting it into service. Although petitioner was not aware of it at the time, he later learned that *509 in connection with the sale of the plane, Jonas Aircraft paid a finder's fee of 12 1/2 percent of the purchase price ($ 34,918.50) to National Management Company, a Bahamian corporation owned by Donald Aberle. During 1980 Michal Rakus leased the aircraft to Transtate under an oral agreement at $ 80 per flight hour with Transtate paying all expenses including maintenance and fuel. Transtate used the plane on regularly scheduled commuter flights between Waterbury-Oxford, JFK, LaGuardia, and Atlantic City. On its 1980 tax return, Michal Rakus reported gross receipts of $ 7,171 from leasing the plane but an overall loss of $ 35,179, which petitioner claimed on his 1980 individual return. Subsequently, petitioner and Michal Rakus sued Transtate for unpaid lease payments, but Transtate went out of business in December of 1980 and its oral lease arrangement with Michal Rakus was terminated. After the failure of Transtate, petitioner on December 31, 1980, merged Michal Rakus into Rakus & Sons, Inc., another Subchapter S corporation which petitioner had formed in October of 1980 and of which he was the only stockholder. Upon the advice of Eisenberg, petitioner used his Miami post office *510 box as the corporate address for Rakus & Sons. Through Rakus & Sons petitioner actively sought to lease the plane during January, February, and March of 1981 and ultimately entered into a lease with Danbury Airways commencing in April of 1981. Under the lease with Danbury, Rakus & Sons was to receive $ 100 per flight hour with a minimum guarantee of 20 hours per month. Danbury used the plane on commuter flights between Danbury, JFK, and LaGuardia. However, the commuter airline industry was adversely affected by the unanticipated strike of the air traffic controllers in the summer of 1981. As a result Danbury terminated the formal lease with Rakus & Sons but continued to use the plane in its charter business under an informal oral agreement. Throughout the remainder of 1981 and all of 1982 Rakus & Sons tried to lease the airplane but had little success because of the traffic controller's strike. By January of 1982 the commuter airline industry had become so depressed that Rakus & Sons changed the insurance coverage on the plane from "All Risk Ground and Flight" to the less expensive "All Risk Ground Not In Motion," a change which was initially opposed by Columbo Trust as the *511 loss payee under the policy. For 1981 and 1982 Rakus & Sons reported gross receipts from the plane of $ 19,634 and $ 4,010, respectively, but overall losses of $ 79,988.86 in 1981 and $ 81,236.97 in 1982 which petitioner claimed on his individual returns. Both of petitioner's corporations, Michal Rakus and its successor, Rakus & Sons, shared an office in New York City with Harold M. Gay, Jr., another Pan Am pilot and friend of petitioner. With the use of the office the corporations maintained a physical presence in the United States even while petitioner was on flights for Pan Am or at his condominium in Nassau. As a result of these activities the corporations incurred usual office expenses such as for rent and telephone. They also incurred expenses for maintaining the airplane during the periods these expenses were not borne by lessees. Petitioner, as the only shareholder and officer of his corporations, periodically inspected the aircraft and made arrangements for its leasing and, when necessary, its maintenance. OPINION Deductions Under Section 913(a) and Exclusions Under Section 911(a)
During 1980 and 1981 an individual who was a bona fide resident of a foreign *512 country could deduct under section 913(a) certain living expenses. [2] To qualify for a deduction under section 913(a) the individual's tax home had to be in the foreign country [3] and section 913(j)(1)(B) defined the individual's tax home as being the same as the individual's tax home under section 162(a)(2)[4] with respect to travel expenses. *513 During 1982, section 911(a) allowed a qualified individual to exclude from gross income foreign earned income. [5] To be a qualified individual under section 911(a) the individual's tax home had to be in a foreign country. Section 911(d) (1). [6] Again the individual's tax home is defined by reference to section 162(a)(2). Section 911(d)(3); [7]section 1.911-2(b), Income Tax Regs.[8]
*514 Respondent contends that petitioner's principal place of business during 1980, 1981, and 1982 was at JFK Airport. Therefore, according to respondent, petitioner's tax home was not in a foreign country and he does not qualify for the exclusion under section 911 in 1982 or for deductions under section 913 in 1980 and 1981. Petitioner claims that his tax home was not at JFK or at any other place in the United States because his principal place of business, if any, was in the cockpit of whatever plane he was assigned to by Pan Am from time to time; and that some of his flights neither originated nor concluded in the United States and when they did he was only over the United States or its territorial waters for a very few minutes. Consequently, petitioner concludes that his tax home was in Nassau under Rev. Rul. 75-432, 1975-2 C.B. 60, 61, which provides that: In the rare case in which the employee has no identifiable principal place of business, but does maintain a regular place of abode in a real or substantial sense in a particular city from which the taxpayer is sent on temporary assignments, the tax home will be regarded as being that place of abode. Petitioner's *515 reliance on Rev. Rul. 75-432 is inappropriate, however, because he did have an "identifiable principal place of business," i.e., the airport, JFK in his case, which constituted his base station during 1980, 1981, and 1982. Folkman v. United States, 615 F.2d 493 (9th Cir. 1980); see also Lagrone v. Commissioner, T.C. Memo. 1988-451; Rider v. Commissioner, T.C. Memo. 1988-288; and Kennedy v. Commissioner, T.C. Memo. 1980-310. Therefore, petitioner's tax home during those years was New York rather than Nassau and he does not qualify in 1980 and 1981 for the deductions provided by section 913(a) or in 1982 for the exclusion provided by section 911(a). Since we have decided these issues on the location of petitioner's tax home, we need not address respondent's alternative arguments. Deductions For Interest Expense
Respondent contends that petitioner is not entitled to deduct that portion of the losses of Michal Rakus, Inc., and its successor which is attributable to interest on the loan to Michal Rakus from Columbo Trust because the loan was not a bona fide transaction but instead was a sham *516 contrived by petitioner to conceal the fact that the funds used to purchase the plane actually belonged to petitioner. To support this claim respondent relies solely upon the testimony of Lance Eisenberg, the attorney who represented petitioner in connection with the organization of his corporations and with respect to the tax consequences of buying and leasing the aircraft. Mr. Eisenberg's testimony on this issue was admitted over petitioner's objection that it violated the attorney-client privilege, and on brief petitioner with our permission renewed the objection and argued that such testimony should not be considered. The question regarding the admissability of the testimony is rendered moot, however, by our finding hereinafter that Mr. Eisenberg's testimony is unworthy of belief. Petitioner contends that the loan from Columbo Trust was bona fide and counters respondent's characterization of the transaction with petitioner's testimony plus documentation including the note, chattel mortgage, insurance policies, and canceled checks evidencing the monthly payments on the loan. We conclude, therefore, that petitioner's straightforward and well documented testimony is more than *517 sufficient to establish that the loan was bona fide and that the interest paid thereon is deductible. Airplane Expenses
Respondent disallowed the deductions for operating expenses claimed by Michal Rakus, Inc., and Rakus & Sons, Inc., petitioner's S corporations, because the aircraft leasing business was not an activity entered into for profit but instead was motivated by a desire to generate tax savings for petitioner. Respondent's determination is presumptively correct and petitioner has the burden of proof on this issue. Rule 142(a); Welch v. Helvering, 290 U.S. 111 (1933). Section 1.183-2(b), Income Tax Regs., contains certain objective factors which are frequently considered in determining the presence or absence of a profit objective. These factors are: (1) The manner in which the taxpayer carries on the activity; (2) the expertise of the taxpayer or his advisors; (3) the time and effort expended by the taxpayer in carrying on the *518 activity; (4) the expectation that assets used in the activity may appreciate in value; (5) the success of the taxpayer in carrying on similar or dissimilar activities; (6) the taxpayer's history of income or losses with respect to the activity; (7) the amount of occasional profits, if any, which are earned; (8) the financial status of the taxpayer; and (9) the elements if any of personal pleasure or recreation associated with the activity. In this case, respondent contends that the lack of a profit objective by petitioner is evidenced by the manner in which he carried on the leasing of the aircraft, the relatively small amount of time and effort expended by him in the business, his lack of any history of success in a similar enterprise, his failure to ever show a profit from the business, and petitioner's financial status at the time the business was commenced. Respondent argues that petitioner adopted a lackadaisical and cavalier approach to the business because he was not personally involved in its day to day activities. Respondent, however, has failed to explain what day to day activities would be expected of the operator of a business that owns and leases a single airplane *519 to a commuter airline that pays all expenses associated with the operation and maintenance of the aircraft. The record reflects that petitioner periodically inspected the plane while it was leased and made reasonable efforts to keep it leased and that his failure to locate new lessees was due to the unexpected strike by air traffic controllers which adversely affected the commuter industry beginning in the summer of 1981. With regard to previous experience, it is true that petitioner had no such experience in leasing airplanes when he entered the business in 1979, but he did have 14 years of experience as a commercial airline pilot. Consequently, he obviously knew what it takes to operate and maintain a commercial aircraft and had some idea of what the prospects for success of a commuter airline might be. Furthermore, he initially consulted with the operators of a commuter airline who were also former executives of Pan Am and who were experienced in the airline industry. Therefore, even though petitioner was a novice in the field, he associated and consulted with individuals who were familiar with the business. It is true that petitioner never realized a profit from his leasing *520 operation, but a profit is not necessary if there is an actual and honest profit objective. Fox v. Commissioner, 80 T.C. 972, 1006 (1983), affd. without published opinion 742 F.2d 1441 (2d Cir. 1984), affd. sub nom. Barnard v. Commissioner, 731 F.2d 230 (4th Cir. 1984), affd. without published opinion sub nom. Hook v. Commissioner, Kratsa v. Commissioner, Leffel v. Commissioner, Rosenblatt v. Commissioner, Zemel v. Commissioner, 734 F.2d 5-7, 9 (3d Cir. 1984). From the record as a whole we agree with petitioner that the controller's strike in 1981 terminated a potentially profitable lease with Danbury and made it impossible for petitioner's corporations to make a profit in 1981 and 1982. As for 1980, it is fairly common for any new business venture to experience a loss in its inaugural year, and the usual risk was compounded by the fact that Transtate, the lessee, also was a new company that did not survive the year. Finally, respondent argues that petitioner whose earnings were substantial, wanted to minimize his income tax with the losses from his corporations because he knew that his section *521 911 and section 913 claims were questionable; and therefore, according to respondent, petitioner attempted to hedge against their possible disallowance with losses from a spurious leasing operation. This argument is pure speculation, however, because it has absolutely no factual basis in the record. In support of his position that he entered the airplane leasing business with a bona fide profit objective, petitioner points to the fact that (1) the profit projections developed by him and his associates during their initial negotiations with Transtate made no mention of any tax savings; (2) he sued Transtate and Gatt in an attempt to collect money owed Michal Rakus, Inc.; and (3) he cut expenses for Rakus & Sons, Inc. by changing its insurance to a cheaper policy when he was unable to lease the aircraft. We agree with petitioner that these are not the actions of a man attempting to maximize losses. Accordingly, from the record as a whole, we are satisfied that petitioner organized and operated his corporations under Subchapter S with the objective of making a profit from the airplane leasing business and consequently the expenses incurred in such business are deductible. Fraud
*522 Section 6653(b) for 1980 and 1981 and section 6653(b)(1) for 1982 provide that "if any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." The burden of proving fraud under section 6653(b) is upon respondent and he must prove the same by clear and convincing evidence. Section 7454(a); Rule 142(b); Green v. Commissioner, 66 T.C. 538 (1976); Arlette Coat Co. v. Commissioner, 14 T.C. 751 (1950). To carry his burden in this case respondent must prove that petitioner intended to evade taxes which he knew were owed by conduct calculated to conceal, mislead, or otherwise prevent the collection of such taxes. Stoltzfus v. United States, 398 F.2d 1002 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Acker v. Commissioner, 26 T.C. 107 (1956), affd. in part, revd. in part 258 F.2d 568 (6th Cir. 1958), affd. 361 U.S. 87 (1959). Respondent contends that he has *523 carried his burden of proof with the following: (1) the testimony of Lance Eisenberg which, according to respondent, establishes that in some unexplained manner the loan in the amount of $ 235,000 made by Columbo Trust to Michal Rakus in connection with the purchase of the airplane was a sham and that the funds used to make the purchase actually belonged to petitioner; (2) the testimony of respondent's agent that petitioner was uncooperative and made evasive and misleading statements during the audit; and (3) the submission during the audit by petitioner of a Form 6450 in which he falsely claimed that he was exempt from withholding under a vow of poverty. We are unable to agree. First, respondent's almost total reliance upon the uncorroborated and questionable testimony of Mr. Eisenberg with respect to the loan is difficult to understand in the absence of any evidence of a possible source for the $ 235,000 in funds purportedly used by petitioner to purchase the airplane. Surely there would have been some evidence available to respondent of the source and amount of the accumulation if it actually existed, yet the record contains no such evidence to corroborate the testimony of Eisenberg. *524 The lack of any such corroborating evidence for Eisenberg's testimony or any explanation for its absence is even more difficult to understand in view of the testimony of petitioner with respect to the loan, which we have found is not only straightforward and credible but is also well-documented with a note, chattel mortgage, insurance policies, and cancelled checks. Mr. Eisenberg's testimony is also questionable because at the time of the trial he had been disbarred and was residing in a federal halfway house as the result of having pleaded guilty to the felony of aiding and abetting another client of his in an attempt to evade and defeat the payment of the client's income taxes. Furthermore, Eisenberg's testimony in this case and his guilty plea in the aiding and abetting case, in which he was sentenced to two years of incarceration followed by a probationary period of five years, were all part of a plea agreement which required Eisenberg to cooperate with the United States in the prosecution of cases against third parties or face further criminal prosecution on still other charges. The credibility of Eisenberg's testimony is also subject to question by the fact that, prior to *525 trial, petitioner had successfully prosecuted a malpractice claim against him for having failed to file a proper election under Subchapter S for one of petitioner's corporations. The lack of credibility of Eisenberg's testimony is so apparent that at one point on brief respondent contends that petitioner's association with Eisenberg, an attorney who was subsequently convicted of attempting to aid and abet another in the avoidance of income tax, is some evidence of petitioner's involvement in a fraudulent scheme. Secondly, while respondent's agent originally testified on direct examination that during the audit petitioner failed to cooperate and made evasive and misleading statements, she subsequently admitted that, even though his work schedule caused difficulty in scheduling conferences with petitioner, he appeared at every meeting she scheduled and produced or attempted to produce the numerous documents requested by her. She also admitted that at one time he had complained to her supervisor about the manner in which she was conducting the audit and the time it was consuming. Thirdly, respondent's agent originally testified that during the audit petitioner had submitted a form *526 in which he falsely claimed that he was exempt from withholding under a vow of poverty. However, on cross examination she admitted not only that the form was undated and unsigned, but also that the manner in which it came to her desk was unknown. Under all of the foregoing circumstances we are satisfied that, while some of petitioner's conduct in this case may have been suspicious, respondent has failed to establish by clear and convincing evidence that any part of any underpayment which exists with respect to his income tax for 1980, 1981, and 1982 was due to a fraudulent intent. Additions to Tax Under Section 6661 and 6654(a)
At trial and on brief petitioner has failed to address the issues involving the additions to tax provided by section 6661 and section 6654(a). Consequently, we conclude that these issues have been conceded by petitioner except to the extent that our holdings on other issues may affect the amounts of the additions. To reflect the foregoing as well as concessions by the parties, Decision will be entered under Rule 155. Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.↩
2. The relevant part of section 913(a) reads as follows: (a) ALLOWANCE OF DEDUCTION. -- In the case of an individual who is -- (1) BONA FIDE RESIDENT OF FOREIGN COUNTRY. -- A citizen of the United States and who establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year * * * there shall be allowed as a deduction for such taxable year or for any taxable year which contains part of such period, the sum of the amounts set forth in subsection (b). ↩
3. Section 913(c) reads in relevant part as follows: (c) DEDUCTION NOT TO EXCEED NET FOREIGN SOURCE EARNED INCOME. -- (1) IN GENERAL. -- The deduction allowed by subsection (a) to any individual for the taxable year shall not exceed -- (A) such individual's earned income from sources outside the United States for the portion of the taxable year in which such individual's tax home is in a foreign country, * * * ↩
4. The relevant part of section 913(j)(1)(B) reads as follows: (j) OTHER DEFINITIONS AND SPECIAL RULES. -- (1) DEFINITIONS. -- For purposes of this section-* * * (B) TAX HOME. -- The term "tax home" means, with respect to any individual, such individual's home for purposes of section 162(a)(2)↩ (relating to traveling expenses while away from home). * * *
5. The relevant part of section 911(a) reads as follows: (a) EXCLUSION FROM GROSS INCOME. -- At the election of a qualified individual * * *, there shall be excluded from the gross income of such individual, and exempt from taxation under this subtitle, for any taxable year -- (1) the foreign earned income of such individual, * * * ↩
6. Section 911(d)(1) reads as follows: (1) QUALIFIED INDIVIDUAL. -- The term "qualified individual" means an individual whose tax home is in a foreign country and who is -- (A) a citizen of the United States and establishes to the satisfaction of the Secretary that he has been a bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year, or (B) a citizen or resident of the United States and who, during any period of 12 consecutive months, is present in a foreign country or countries during at least 330 full days in such period. ↩
7. The relevant part of section 911(d)(3) reads as follows: (3) TAX HOME. -- The term "tax home" means, with respect to any individual, such individual's home for purposes of section 162(a)(2)↩ (relating to traveling expenses while away from home). * * * 8. Regulation section 1.911-2(b) reads as follows: (b) Tax home. For purposes of paragraph (a)(1) of this section, the term "tax home" has the same meaning which it has for purposes of section 162(a)(2) (relating to travel expenses away from home). Thus, under section 911↩, an individual's tax home is considered to be located at his regular or principal (if more than one regular) place of business or, if the individual has no regular or principal place of business because of the nature of the business, then at his regular place of abode in a real and substantial sense. An individual shall not, however, be considered to have a tax home in a foreign country for any period for which the individual's abode is in the United States. Temporary presence of the individual in the United States does not necessarily mean that the individual's abode is in the United States during that time. Maintenance of a dwelling in the United States by an individual, whether or not that dwelling is used by the individual's spouse and dependents, does not necessarily mean that the individual's abode is in the United States.