T.C. Summary Opinion 2016-37

UNITED STATES TAX COURT

MICHAEL D. HIRSCH AND JANE HIRSCH, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 28402-13S.                    Filed  August 8, 2016.

Michael D. Hirsch and Jane Hirsch, pro sese.

Rose E. Gole, Jane J. Kim, and Eliezer Klein, for respondent.

SUMMARY OPINION

PANUTHOS, Chief Special Trial Judge:  This case was heard pursuant to

the provisions of section 7463 of the Internal Revenue Code in effect when the

petition was filed.[1]  Pursuant to section 7463(b), the decision to be entered is not

_____

[1]Unless otherwise indicated, subsequent section references are to the

(continued...)

reviewable by any other court, and this opinion shall not be treated as precedent for any other case.

Respondent determined Federal income tax deficiencies and accuracy-related penalties as follows:

|       |            | Penalty     |
| Year  | Deficiency | sec. 6662(a) |
|-------|------------|-------------|
| 2009  | $21,647    | $4,329      |
| 2010  | 32,584     | 6,517       |
| 2011  | 15,112     | 3,022       |

After concessions,[2] the issues for decision are: (1) whether petitioners are entitled to foreign earned income exclusions of $87,136, $91,500, and $52,154 for

_____

[1](...continued)
Internal Revenue Code (Code) in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Respondent concedes that petitioners are entitled to deduct $7,114, $7,788, and $3,715 of home mortgage interest for tax years 2009, 2010, and 2011, respectively, and $4,088, $5,180, and $2,831 of real estate taxes for tax years 2009, 2010, and 2011, respectively. Additionally petitioners are entitled to deduct $8,670 of State and local income taxes paid for 2009. Although at trial respondent took issue with the capital loss carryforwards of $3,000 for each of the 2009, 2010, and 2011 years, he conceded this issue in his memorandum of law. Petitioners concede that they received $740 in unreported taxable interest income for tax year 2011, and $3,079 and $3,206 in unreported taxable State income tax refunds from the States of New York and New Jersey, respectively, for tax year 2010.

tax years 2009, 2010, and 2011, respectively;[3] (2) whether petitioners are entitled to employee business expense deductions claimed on Schedules A, Itemized Deductions, for petitioner Michael D. Hirsch's travel expenses between Israel and the United States of $39,050, $30,266, and $36,938 for tax years 2009, 2010, and 2011, respectively; and (3) whether petitioners are liable for accuracy-related penalties under section 6662 of $4,329, $6,517, and $3,022 for tax years 2009, 2010, and 2011, respectively.

Background

Some of the facts have been stipulated, and we incorporate the stipulation and the accompanying exhibits by this reference. At the time the petition was timely filed petitioners resided in Israel. During the years in issue Michael D. Hirsch (petitioner), a U.S. citizen, was employed full time by Merrill Lynch, Pierce, Fenner & Smith Inc. (Merrill Lynch), as a team member of the Lynnvest Group with the job title of investment associate. Petitioner serviced only clients of the Lynnvest Group. Petitioner was initially hired by Advest, Inc. (Advest), in 1999 as an investment adviser; and after Merrill Lynch acquired Advest in 2005,

---

[3]Petitioners claimed foreign earned income exclusions of $91,400 and $73,217 for tax years 2009 and 2011, respectively, but conceded that they are not entitled to foreign earned income exclusions in excess of $87,136 and $52,154 for tax years 2009 and 2011, respectively.

petitioner became an employee of Merrill Lynch.  Petitioner resigned from Merrill Lynch in December 2012.

During the years in issue the Lynnvest Group's offices were in New Jersey. Approximately 80% of the Lynnvest Group's clients were based in the United States and approximately 75% of the Lynnvest Group's income was from investment management fees paid by clients.

While working for Merrill Lynch petitioner specialized in multifund portfolios.  Petitioner's responsibilities included meeting and consulting with prospective and current clients, selecting funds in which to invest, and reviewing all portfolios at least monthly.  Petitioner also performed quantitative and qualitative research into mutual funds for client investments, which included telephone and in-person discussions with fund managers.

Petitioners moved to Israel in 1993.[4]  At the time of the move petitioner was employed by Republic National Bank as chief investment officer.  Petitioners owned a home in Israel which was their primary residence and paid real estate taxes on this property.  Petitioners were citizens of both Israel and the United States, and they voted in Israeli local and national elections in addition to absentee

---

[4]The parties agree that the move to Israel in 1993 was for both personal and business reasons.

voting in U.S. elections. Petitioners were not members of any clubs or organizations based in the United States but were members of a synagogue and the English Speakers Residents Association (ESRA) in Israel. Petitioner's decision to live in Israel during the years in issue was motivated by his personal preference to reside there. Petitioner continued to reside in Israel after his employment with Republic National Bank ended. When petitioner began working for Merrill Lynch in 2005, the company was well aware that he was living in Israel; however, Merrill Lynch did not require that he live in Israel.

Petitioner split his work time between Israel and the United States, spending approximately two-thirds of his time in Israel and one-third of his time in the United States. Petitioner was in the United States for at least 122, 85, and 105 days in 2009, 2010, and 2011, respectively. Petitioner did not have a regular schedule but tried to be in the United States at least once a month, skipping months such as December when clients might not be available. A typical trip to the United States lasted about 10 days, with petitioner departing from Israel on the Sunday of the first week and returning on Wednesday evening of the second week. If petitioner had clients in Manhattan, he would work out of the Citicorp Center office, which was designated the international office for employees based

overseas. During these trips petitioner would stay at his daughter's home in New York.

Petitioner used his sister-in-law's address in New York as his mailing address for Merrill Lynch. Petitioner's Forms W-2, Wage and Tax Statement, issued by Merrill Lynch for the relevant tax years, were mailed to his sister-in-law's address, and the same address was listed as petitioner's personal address in Merrill Lynch personnel records. Additionally, petitioner owned a car in the United States which was registered in his name using his sister-in-law's address in New York.

Petitioner was limited by the firm and his licensing as to where he could conduct business. According to Merrill Lynch's records, petitioner was authorized to work only out of the branch offices where the Lynnvest Group was located and Merrill Lynch's various office locations in New Jersey and New York. Petitioner's home in Israel was not listed in Merrill Lynch employee records as an alternate work location. Additionally, petitioner was not authorized to work out of the Merrill Lynch office in Tel Aviv, Israel, and Merrill Lynch did not provide petitioner with an Israeli telephone number when he was working in Israel. Petitioner was not licensed to conduct business in Israel and was not registered by Merrill Lynch with the Financial Industry National Regulatory Association

(FINRA) in Israel. Registration is required for investment associates and financial advisers in countries in which they conduct business.

Petitioner's ability to conduct business was limited by laws on U.S. citizens working abroad, including in Israel.[5] On July 1, 2005, Advest issued a memorandum to petitioner limiting his ability to contact or meet with clients in Israel. While in Israel, petitioner could not solicit, contact, meet with, or have discussions or communications with existing or potential clients. Further, petitioner could not add any new client accounts or open new accounts related to existing clients in Israel, regardless of petitioner's location. This policy remained in place when Merrill Lynch acquired Advest, and Merrill Lynch issued a memorandum on May 25, 2006, to that effect. While in Israel, petitioner was limited to reviewing and monitoring trades and client portfolios and relaying this information to the branch office. Because of these restrictions, petitioner could not seek out clients or work with clients in Israel; he could only respond to clients seeking out his services. Petitioner could not call a client or a prospect, or advertise in any way; he could only react to a client by answering a telephone call or meeting with a person that sought him out in Israel if he or she wanted to meet

---

[5]The parties agree that post-9/11 laws regulating U.S. citizens working abroad limited petitioner's ability to conduct business in Israel.

there. Petitioner could not return missed calls when in Israel; he could only answer the telephone when a client called.

Before petitioner starting working at Advest in 1999, he established an arrangement with Charles Lipton. This arrangement continued throughout the years in issue. As part of this arrangement, Mr. Lipton was responsible for operational and administrative matters and was in charge of sales, and petitioner had the role of investment manager. Petitioner and Mr. Lipton decided to work under one broker number, with the number in Mr. Lipton's name in the U.S., and petitioner and Mr. Lipton split profits evenly.

During his time in Israel petitioner performed investment management research and portfolio management work. Merrill Lynch's operating system was installed on a laptop, and petitioner had full access to the Merrill Lynch system to check daily activity or new client accounts, information he needed to perform his investment research and portfolio management work in Israel. Petitioner kept work files in his home in Israel which consisted of notes from prior meetings and calls with portfolio managers of various funds. The files at his home in Israel could have been moved to the United States and stored there.

Merrill Lynch did not reimburse travel and other expenses for investment associates, including petitioner, for the years in issue.

Petitioners timely filed their joint Federal income tax returns for 2009, 2010, and 2011. Respondent issued a notice of deficiency disallowing petitioners' foreign earned income exclusions and unreimbursed employee expense deductions, among other items.[6] Petitioners timely filed with the Court a petition seeking redetermination of the deficiencies as well as the accuracy-related penalties.

For the reported unreimbursed employee expenses petitioner provided copies of airplane travel invoices to respondent in the amounts of $15,644, $22,089, and $16,615 for 2009, 2010, and 2011, respectively. Petitioner also produced copies of receipts for taxicabs, parking, tolls, and other fees, but there are discrepancies with some of the receipts.[7]

## Discussion

### I. Burden of Proof

In general, the Commissioner's determination set forth in a notice of deficiency is presumed correct, and the taxpayer has the burden of proving

---

[6]See supra note 1 for a discussion of other income and expense items in the notice of deficiency that were conceded by the parties.

[7]Petitioner provided respondent with copies of travel receipts, including taxicab, parking, and toll fees, as Exhibit 11-P. Petitioner offered the receipts as evidence. While respondent objected to some of the receipts on grounds of hearsay and authenticity, we need not make any ruling given our holding infra.

otherwise. Rule 142(a); <u>Welch v. Helvering</u>, 290 U.S. 111, 115 (1933). Pursuant to section 7491(a), the burden of proof as to factual matters shifts to the Commissioner under certain circumstances. Petitioners did not allege or otherwise show that section 7491(a) applies. <u>See</u> sec. 7491(a)(2)(A) and (B). Therefore, petitioners bear the burden of proof on the issues raised in the notices of deficiency. <u>See</u> Rule 142(a).

## II.     Foreign Earned Income Exclusion

Section 61(a) specifies that "[e]xcept as otherwise provided", gross income includes "all income from whatever sources derived". The United States employs a worldwide tax system, taxing its citizens on their income regardless of its geographic sources. There are exceptions to the general rule, such as the foreign earned income exclusion under section 911. However, exemptions and exclusions from taxable income are construed narrowly, and the taxpayers must bring themselves within the clear scope of the exclusions. <u>See, e.g.</u>, <u>Commissioner v. Jacobson</u>, 336 U.S. 28 (1949).

Section 911(a) provides that a "qualified individual" may elect to exclude from gross income, subject to limitations set forth in subsection (b)(2), his or her "foreign earned income". Foreign earned income is the income earned from services performed within a foreign country. Sec. 911(b)(1)(A). To be entitled to

this exclusion, a taxpayer must satisfy two distinct requirements. First, he must be an individual "whose tax home is in a foreign country." Sec. 911(d)(1). Second, he must be either a "bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year" or a U.S. resident or citizen present in a foreign country during at least 330 days in a 12-month period. Sec. 911(d)(1)(A) and (B).

Since the parties agree that petitioners are bona fide residents of Israel, a foreign country, we need not consider whether petitioner qualifies as a "bona fide resident of a foreign country or countries for an uninterrupted period which includes an entire taxable year". See sec. 911(d)(1)(A). Thus we consider whether petitioner's "tax home" during the years 2009 through 2011 was in Israel under section 911(d)(1).

Section 911(d)(3) defines the term "tax home" for an individual taxpayer as his "home for purposes of section 162(a)(2)". Under section 162(a)(2) a taxpayer's tax home is generally considered to be the location of his regular or principal place of business, and not where his personal residence is located. Mitchell v. Commissioner, 74 T.C. 578, 581 (1980). A taxpayer's "abode" is his personal residence, and for purposes of section 911(d)(3) "abode" has a "domestic rather than vocational meaning". Bujol v. Commissioner, T.C. Memo. 1987-230,

53 T.C.M. (CCH) 762, 763-764 (1987), aff'd without published opinion, 842 F.2d 328 (5th Cir. 1988). The Court determines the taxpayer's country of abode by considering where he has the strongest economic, family, and personal ties. Id., 53 T.C.M. (CCH) at 764; see Evans v. Commissioner, T.C. Memo. 2015-12, at *9.

A principal place of business can be identified by looking at the employer's practices and the place the employer has identified as the taxpayer's principal place of business in its records. See Bjornstad v. Commissioner, T.C. Memo. 2002-47, 2002 WL 238507, at *2; Sislik v. Commissioner, T.C. Memo. 1989-495, 58 T.C.M. (CCH) 115 (1989), aff'd per curiam, 1992 U.S. App. LEXIS 15691 (D.C. Cir. May 22, 1992).[8] In Sislik, the taxpayer, a commercial pilot for Pan Am, was a bona fide resident of Nassau, Bahamas, for solely personal reasons. Sislik v. Commissioner, 58 T.C.M. (CCH) at 115-116. The taxpayer's "base station," where Pan Am considered his flights to originate, was John F. Kennedy International Airport (JFK) in New York. Id. at 116. On paper a Pan Am pilot's flight patterns originated and returned to his base station, and his administrative

---

[8]Since petitioner resided in Israel at the time the petition was filed, appeal of any decision (if a decision in this case were appealable) would be to the Court of Appeals for the District of Columbia Circuit. See secs. 7463(b), 7482(b)(1)(A), 7701(a)(39)(A). We have previously held that even though a case is designated a small tax case and not subject to appeal, the Court's holding in Golsen will apply. See Golsen v. Commissioner, 54 T.C. 742, 757 (1970), aff'd, 445 F.2d 985 (10th Cir. 1971).

records were maintained there.  Id.  Additionally, the taxpayer was under the administrative supervision of his base station except when in flight, when he was supervised by the nearest Pan Am base station.  Id.  The Court held for these reasons the taxpayer's "identifiable principal place of business", and thus his tax home, was JFK in New York.  Id. at 119.

Further, in Bjornstad v. Commissioner, 2002 WL 238507, at *1, the taxpayer was employed as a musician with a band based in Chicago, Illinois, but chose to live in Stoughton, Wisconsin, with his parents so he could save money.  The taxpayer would regularly travel by bus to Chicago for a long weekend, leaving on Thursday or Friday and returning on Monday.  Id.  The taxpayer traveled to Chicago because the band performed regular shows in the city, including a regular show Sunday nights at a nightclub, and the band would depart from Chicago when it traveled to other cities for engagements.  Id.  For these reasons the Court held that the taxpayer's regular place of business was in Chicago, and thus Chicago was the taxpayer's tax home.  Id. at *5-*6.

We find that petitioner's abode was in Israel.  Petitioners lived in Israel and owned a house on which they paid real estate taxes.  Petitioners had Israeli citizenship, voted in Israeli elections, and were members of a synagogue and ESRA in Israel.  Petitioner traveled to the United States only to meet with clients

and perform other work-related duties. Petitioner did not maintain a residence in the United States. When he was in town for work, he stayed at his daughter's house in New York. Thus, petitioner's strongest economic, family, and personal ties were in Israel. See Evans v. Commissioner, at *9; Bujol v. Commissioner, 53 T.C.M. (CCH) at 763-764.

We conclude that petitioner's tax home was in the United States and not Israel. Similar to the taxpayer's employer in Sislik, which designated JFK airport in New York as the base of operations, petitioner's employer identified the Lynnvest Group's New Jersey offices as petitioner's authorized work location, his principal place of business. According to Merrill Lynch's records, petitioner worked out of the New Jersey offices and had an address where he received his mail from Merrill Lynch, including his Forms W-2, in nearby New York. Petitioner was also authorized to work out of other locations in New Jersey and New York, but according to employment records he was not authorized to work out of his home in Israel or out of the Merrill Lynch office in Tel Aviv, Israel. Merrill Lynch did not provide petitioner with an Israeli telephone number or office space. See Bjornstad v. Commissioner, 2002 WL 238507, at *5-*6; Sislik v. Commissioner, 58 T.C.M. (CCH) at 119.

Petitioner argues that his place of business was in Israel because he performed all of his research and fund management while in Israel. Petitioner also claims that he had to be in Israel to have access to his work files stored in his home office, claiming that he needed the research and notes in those work files to conduct his specialized investment approach through mutual funds. But there was nothing about these files that necessitated their storage in Israel; instead petitioner kept them there because of his personal choice to live in Israel and work from his home in Israel. Petitioner also could have performed this research while in the United States, using the laptop with Merrill Lynch's operating system. There was nothing about the nature of his work or Merrill Lynch's requirements that necessitated his conducting the research while in Israel. The choice to work in Israel was made solely for personal reasons. See Sislik v. Commissioner, 58 T.C.M. (CCH) at 115-116.

Petitioner indicates that when he had clients in Manhattan, at Merrill Lynch's suggestion he would meet these clients at the Citicorp Center office, an office designated for use by overseas-based employees when they had clients in the United States. Petitioner asserts that this reaffirms that he was considered an

"international employee."[9] The fact that Merrill Lynch permitted petitioner to use office space in New York to entertain clients did not make him an international employee. There is nothing in Merrill Lynch's records to indicate that petitioner was considered an employee of a location other than the Lynnvest Group's offices in New Jersey.

Petitioner also suggests that he was not licensed as a financial adviser or registered with FINRA because of his desire to continue his arrangement with Mr. Lipton while in Israel. This may have been the case when petitioner moved to Israel in 1993, but the parties agree that laws restricting U.S. citizens working in foreign countries prevented petitioner from registering and working as a financial adviser and soliciting clients in Israel during the years in issue. This restriction was affirmed by policies set forth in memoranda issued by both Advest and Merrill Lynch. Additionally, this arrangement with Mr. Lipton to work under one broker number was a personal decision and was not required or requested by Merrill Lynch.

On the basis of this record we are satisfied that petitioner's tax home was in the New York metropolitan area, and not Israel. We conclude that petitioner failed

---

[9]We presume that petitioner believes that his being considered an "international employee" would change the outcome of this case.

to meet both requirements for the foreign earned income exclusion under section 911(d)(1). The parties agree that petitioner qualified as a bona fide resident of a foreign country and thus met the second requirement under section 911(d)(1). Petitioner did not meet the first requirement of the foreign earned income exclusion since his tax home was in the United States and not in a foreign country as required by section 911(d)(1). Accordingly, petitioner is not entitled to claim the foreign earned income exclusion for 2009, 2010, or 2011.

III.   Travel and Other Expenses

Generally, a taxpayer who is an employee may deduct unreimbursed employee expenses as an ordinary and necessary business expense under section 162. Lucas v. Commissioner, 79 T.C. 1, 6 (1982). In addition, section 6001 requires a taxpayer to maintain sufficient records to allow the determination of the taxpayer's correct tax liability.

Regarding travel to and from a taxpayer's place of work, the "normal expectation * * * is that the taxpayer will choose to live near his place of employment." See Frederick v. United States, 603 F.2d 1292, 1295 (8th Cir. 1979). A taxpayer must have some business justification beyond merely personal reasons for maintaining a residence that is remote from his place of business if he wishes to deduct the travel expenses or duplicate living expenses. See Tucker v.

Commissioner, 55 T.C. 783, 787-788 (1971). As discussed previously, we have concluded that petitioner's tax home was in the United States (New York metropolitan area) and that he resided in Israel for personal reasons.

There is an exception to the general rule where a taxpayer's employment is expected to be temporary or last for a short period. In such circumstances a taxpayer may be able to deduct the travel expenses to and from the temporary job site. Id. at 786. Work prospects that are expected to continue for an "indefinite" period of time do not fall within this temporary employment exception. Walker v. Commissioner, 101 T.C. 537, 549-550 (1993); Nulsen v. Commissioner, T.C. Memo. 1984-307, 48 T.C.M. (CCH) 297, 299 (1984). A taxpayer is not considered "temporarily away from home" on a work assignment if the assignment is for more than 1 year. Sec. 162(a) (flush language). The purpose for allowing deductions for travel to and from a temporary business location is to assist a taxpayer who must temporarily be away from his residence for an employment-based need, when it would be unreasonable to expect him to move indefinitely. Tucker v. Commissioner, 55 T.C. at 786.

For taxpayers not falling within this temporary work assignment exception, costs of traveling to and from a place of business are considered personal and not deductible. Commissioner v. Flowers, 326 U.S. 465, 473-474 (1946). In Flowers

the Court held that the taxpayer, whose job for a railroad was based in Mobile, Alabama, but who chose for personal reasons to live in Jackson, Mississippi, could not deduct the expenses for traveling back and forth between Mobile and Jackson as an ordinary and necessary business expense. Id. at 467, 473-474. When hired by his employer for the relevant tax years, the taxpayer accepted his job with the condition that he be allowed to keep living in Jackson. The railroad accommodated his request but did not have a business reason for the taxpayer to live in Jackson. Id. at 474. Further, in Bjornstad v. Commissioner, 2002 WL 238507, at *3, the Court held that the taxpayer could not deduct travel expenses between the taxpayer's tax home in Chicago and his home in Stoughton, Wisconsin, because the taxpayer was living in Stoughton solely for personal reasons and did not have a business justification.

Petitioner has not claimed he was on a temporary work assignment.[10] Similar to the taxpayers in Flowers and Bjornstad, petitioner chose to reside in a

_____

[10]Although petitioner did not claim he was on a temporary work assignment, we did consider whether he could be considered on a temporary work assignment to determine whether he fell under the exception set forth in Tucker v. Commissioner, 55 T.C. 783 (1971). Petitioner's position with Merrill Lynch was as a regular employee, to last for an indefinite period, and his position lasted longer than 1 year, approximately 7 years from 2005 until the end of 2012. Thus petitioner's work assignment with Merrill Lynch was not temporary. See sec. 162(a) (flush language); Walker v. Commissioner, 101 T.C. 537, 539-540 (1993); Nulsen v. Commissioner, T.C. Memo. 1984-307, 48 T.C.M. (CCH) 297, 299 (1984).

location remote from his employer's place of business for personal reasons. His employer did not require him to live remotely, nor did his employer benefit from this choice of residence. Even if petitioners' move to Israel in 1993 was made partially for business reasons, petitioner was working for a different employer at the time. During the years in issue petitioner's decision to live in Israel was purely personal. Also similar to the taxpayer's employer in Flowers, petitioner's employer accommodated his choice of residence but did not gain anything from the arrangement, for reasons previously discussed. See Commissioner v. Flowers, 326 U.S. at 474; Bjornstad v. Commissioner, 2002 WL 238507, at *2.

Thus petitioner's unreimbursed expenses for travel between Israel and the United States for tax years 2009, 2010, and 2011 are considered personal expenses and are not deductible as ordinary and necessary business expenses. Since none of petitioner's unreimbursed travel expenses are deductible ordinary and necessary business expenses, we do not address whether his records were sufficient to substantiate the expenses.

IV.   Accuracy-Related Penalty

Section 6662(a) and (b)(2) imposes a penalty of 20% of the portion of an underpayment of tax attributable to a substantial understatement of income tax. An understatement of income tax is substantial if the amount of the

understatement for the taxable year exceeds the greater of 10% of the tax required to be shown on the return or $5,000. See sec. 6662(d)(1); sec. 1.6662-4(b), Income Tax Regs. To compute an understatement, the amount of tax shown on the return is subtracted from the amount of tax required to be shown on the return. Sec. 1.6662-4(b)(ii)(2), Income Tax Regs. The Commissioner bears the burden of production with respect to a section 6662 penalty. Sec. 7491(c). Respondent met his burden of production by showing that petitioner's wages did not qualify as foreign earned income and he could not claim unreimbursed employee expense deductions. The burden of proof thus shifts to petitioner to show that the penalty does not apply. See Higbee v. Commissioner, 116 T.C. 438, 447 (2001).

The understatement for each year is greater than the greater of $5,000 or 10% of the tax required to be shown on the return. Because of concessions by respondent and petitioners, the computation of the understatements appears to require Rule 155 computations.[11]

_____

[11]See below the calculations for understatements based on the notice of deficiency. Although respondent made some concessions for petitioner's deductions, the amounts conceded were relatively small compared to the amounts of foreign earned income exclusions and unreimbursed employee expense deductions disallowed. Even after concessions it is clear that the understatement is greater than the greater of $5,000 or 10% of the tax required to be shown on the return for each year.

(continued...)

The section 6662(a) accuracy-related penalty does not apply with respect to any portion of an underpayment if the taxpayer proves that there was reasonable cause for such portion and that he acted in good faith. Sec. 6664(c)(1). The determination of whether a taxpayer acted with reasonable cause and in good faith depends on the pertinent facts and circumstances, including: (1) the taxpayer's efforts to assess the proper tax liability; (2) the knowledge and the experience of the taxpayer; and (3) any reliance on the advice of a professional, such as an accountant. Sec. 1.6664-4(b)(1), Income Tax Regs. An honest misunderstanding of fact or law that is reasonable in the light of the knowledge, experience, and education of the taxpayer may constitute reasonable cause and good faith. Id. The taxpayer bears the burden of proving that he or she falls within this exception. Higbee v. Commissioner, 116 T.C. at 447.

---

[11](...continued)

| Year | Tax reported | Understatement | Tax required | 10% of Tax required |
|------|--------------|----------------|--------------|---------------------|
| 2009 | -0- | $21,647 | $21,647 | $2,165 |
| 2010 | $19,780 | 32,584 | 52,364 | 5,236 |
| 2011 | -0- | 15,112 | 15,112 | 1,511 |

A taxpayer may demonstrate reasonable cause and good faith by showing reliance on professional advice from a tax return preparer where the taxpayer has disclosed all the relevant facts to the preparer. Evans v. Commissioner, at *16. In Evans the taxpayers, who were seeking a foreign earned income exclusion for the taxpayer husband's income earned in Russia, had their returns prepared by a competent tax return preparer. Id. The taxpayer husband's mother, who oversaw his financial affairs under a power of attorney, provided the preparer with the information to prepare the returns and gave him "full disclosure * * * of all relevant facts" concerning the employment in Russia. Id. at *6, *16. The Court held that since the foreign earned income exclusion is a "technical area of tax law", the taxpayers "reasonably relied on the advice they were given." Id. at *17.

Petitioner is a professional investment associate with a background in finance who has been practicing for many years. Petitioner is a sophisticated taxpayer who understands financial markets well and is experienced in researching complex issues. See sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners' tax returns for all three years in issue were prepared by a professional, Mr. Kantzos, a C.P.A. based in the United States. Unlike the Court in Evans, we do not know the competence of the preparer or whether petitioners supplied Mr. Kantzos with all relevant information. There is insufficient evidence

to establish whether petitioners provided Mr. Kantzos with complete and accurate information about the nature of petitioner's work or the restrictions imposed by law and by his employer in conducting business in Israel. Additionally, it is not clear whether petitioner's preparer was informed that Merrill Lynch did not require him to live in Israel.[12] See Evans v. Commissioner, at *16. Petitioner also has not provided evidence of any efforts he might have made to ascertain whether his tax treatment of the foreign earned income and travel expenses was correct. We are not satisfied that petitioners can claim reliance on the advice of a tax professional as a basis for reasonable cause. See Higbee v. Commissioner, 116 T.C. at 447; sec. 1.6664-4(b)(1), Income Tax Regs.

Petitioners also assert as a basis for reasonable cause and good faith that respondent examined their returns for tax years 2006 through 2008, and the examiners did not disallow items similar to those at issue here during the examination(s).[13] Petitioners claim that they relied on the examiners not taking

---

[12]Petitioners' tax return preparer did not testify at trial.

[13]In his response to respondent's motion for partial summary judgment, which we denied on August 4, 2015, petitioner asserted that petitioners' tax returns for years 2006 through 2008 were examined by respondent, and that the exclusions and deductions at issue were allowed. Petitioner asserts that "[n]one of the supposedly relevant case law cited in the Request was ever put forward by any IRS personnel" and that he even received a refund for one of the years. On the

(continued...)

issue with their exclusions and deductions as affirmation that their methodology was correct. Since each year stands on its own and is separately considered, even if respondent had previously allowed the exclusions and deductions at issue for tax years 2006 through 2008, respondent is not bound to follow the same treatment for tax years 2009 through 2011. See Saunders v. Commissioner, T.C. Memo. 2012-200, slip op. at 7.

Petitioners have provided insufficient evidence to show that there was reasonable cause for the underpayment and that they acted with reasonable cause and in good faith. Accordingly we hold that petitioners are liable for the accuracy-related penalty for tax years 2009, 2010, and 2011.

We have considered all of the parties' arguments, and, to the extent not addressed herein, we conclude that they are moot, irrelevant, or without merit.

To reflect the foregoing,

Decision will be entered

under Rule 155.

---

[13](...continued)
basis of petitioner's statements it is unclear whether there were one or three examinations; he refers to an examination for years 2006 through 2008 but also refers to three examinations and three separate audit teams. Petitioner also made this assertion at trial. Petitioner has not provided evidence of the examination(s) or the results thereof.